# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs February 27, 2013

## STATE OF TENNESSEE v. DAVID CHARDWICK WOOTEN

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2010-D-3322      Cheryl Blackburn, Judge**

---

**No. M2012-00366-CCA-R3-CD - Filed August 6, 2013**

---

A Davidson County Criminal Court Jury convicted the appellant, David Chardwick Wooten, of two counts of aggravated sexual battery, a Class B felony, and the trial court sentenced him to ten years for each conviction to be served concurrently.  On appeal, the appellant contends that (1) the evidence is insufficient to support the convictions; (2) the State's inadequate election of offenses deprived him of his constitutional right to a unanimous verdict for count 2; and (3) the trial court should have granted his request for a mistrial when a State witness testified that he refused to take a polygraph examination.  Based upon the record and the parties' briefs, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court are Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the Court, in which JAMES CURWOOD WITT, JR., and D. KELLY THOMAS, JR., JJ., joined.

James O. Martin, III, Nashville, Tennessee, for the appellant, David Chardwick Wooten.

Robert E. Cooper, Jr., Attorney General and Reporter; Benjamin A. Ball, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Kristin Menke, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## I.  Factual Background

In November 2010, the Davidson County Grand Jury indicted the appellant for four counts of aggravated sexual battery.  According to the indictment, the offenses occurred between July 1, 2004, and November 30, 2004.  The victim of the offenses was the

appellant's daughter, who was born on April 29, 1994.

At the appellant's October 2011 trial, the then seventeen-year-old victim testified that she currently lived with her fourteen-year-old brother, Z.W., and her mother, S.W.[1] In 2004, the victim's parents were married but separated for three or four months. The victim was about ten years old and in the fifth grade, and she and Z.W. spent Wednesdays and every other weekend with the appellant at his Preston Run apartment in Hendersonville. The victim and Z.W. slept in the appellant's bed with him, or sometimes the victim slept in the bed with the appellant while Z.W. slept on the floor. When the victim and her brother both slept in the bed with the appellant, the victim or the appellant slept in the middle.

The victim testified that she would awake with the appellant's hands "down [her] pants." She explained that the appellant's hands would "go up [her] shorts, like the bottom" and be inside her panties. She stated that the appellant touched the inside of her labia but outside her vagina and that he moved his fingers "[b]ack and forth like up and down." The victim said she was scared and would "just try and move and roll over." When she rolled over, the appellant stopped touching her. The State asked her if the appellant ever touched her when Z.W. was not in the bed. The victim said yes and stated, "I just remember that there was enough room where I could roll over. And when there was all three of us, it was really squeezed together. We were all tight." One time, the appellant got out of bed after he touched her and washed his hands. The State asked the victim if she knew how many times the appellant touched her, and the victim answered, "No, I just knew it happened enough where I would want to wear pants." She said that when she wore pajama pants or sweat pants, the appellant would not touch her. During the abuse, the victim never said anything to the appellant, and he never said anything to her. She said that her parents reconciled and that "then there was a long period of time, and then it was one last time and it stopped." Sometime after her parents got back together, the appellant told the victim that she should not say anything about the abuse and that he would try to get her a cellular telephone for Christmas. The victim said she got the telephone for Christmas when she was eleven years old and in the sixth grade.

The victim testified that about two years before trial, the appellant spanked her "really hard." The victim was very upset; telephoned her friend, Brittany Kuntz; and went to Kuntz's house for a while. There, she told Kuntz and Kuntz's mother, Samantha Searcy, about the touching. The victim said she revealed the abuse to them because it had been "eating away" at her and because

I was just tired of the way everything was. And I got in trouble

---

[1]To protect the victim's identity, we will refer to her brother and mother by their initials.

for anything and everything, and it wasn't like normal punishment. It wasn't like you're grounded for a week. It was let me throw my cell phone at your knee, let me hit you and push you, spank you as hard as I can.

After the victim revealed the abuse, Searcy telephoned S.W., and S.W. arrived at Searcy's home. Searcy told S.W. about the appellant's touching the victim, and S.W. left to talk with the appellant. Later that day, the victim talked with her parents at home. S.W. thought the victim was lying. That night, the victim talked with S.W. privately and told S.W. "more in detail" about what had happened with the appellant. S.W. started to believe the victim. The next morning, S.W. left for a business trip while the victim and Z.W. stayed home with the appellant. The victim said she was not afraid to stay with the appellant because he had not sexually abused her for two or three years.

The victim testified that while S.W. was gone, the appellant woke her one night and told her that she needed to telephone S.W. and tell S.W. that she had lied about the abuse. Otherwise, the appellant and S.W. were going to "split up," and the victim "was going to be the cause of it all." The victim did as the appellant instructed. The victim said that after she got off the telephone with her mother, the appellant told her that "he felt sorry for everything that had happened and ever since it happened he felt like a horrible person and he felt like going to hell." The victim said her family did not discuss the abuse again until January 2010. At that time, the victim revealed to S.W. that the appellant had made her call S.W. and claim that she lied about the touching. She said that she told S.W. she had been truthful about the sexual abuse and that S.W. "immediately started crying and knew exactly that [she] was telling the truth." Later that day, S.W. confronted the appellant. The next night, the victim's parents told her that they were going to divorce, that it was not her fault, and that the appellant had "confessed everything" to S.W. One or two weeks later, the appellant moved out of their home. The victim had wanted to keep a relationship with the appellant and continued to see him. However, at some point, the victim stopped visiting him because he said something rude to her and "was just really mean like he used to be." About two weeks later, a no contact order was entered, which prevented the victim and her brother from visiting the appellant. At the time of trial, the victim had not spoken with him since July or August 2010.

On cross-examination, the victim denied going through a "lying stage" when she was thirteen years old. She acknowledged that a woman named Joanne interviewed her about the abuse and that she told Joanne the appellant touched her four or five times. She said that Joanne "wanted me to give her a number" and that "I didn't want to be like, oh, it happened nine times and that be an exaggeration." She denied fighting with her brother about who would get to sleep in the middle of the appellant's bed and acknowledged that she told her

-3-

mother the appellant penetrated her. On the day in January 2010 when the victim reaffirmed the abuse to her mother, the victim's parents had been fighting. The victim acknowledged that she had felt "badly" for her mother, but she denied reaffirming the abuse in order to make her mother feel better. She said that the appellant was the primary disciplinarian in the family and acknowledged that he was more strict than her mother. She also acknowledged that a spanking led to her revelation about the sexual abuse and that she thought she was too old to be spanked. The victim said the appellant never did anything inappropriate to her in her bedroom.

On redirect examination, the victim acknowledged that the appellant did not sexually abuse her every time she visited his apartment in 2004. She said she told her mother that the appellant penetrated her because she "didn't really understand what all the words meant." Although the victim had told her mother that the appellant "fingered" her, she was incorrect; the appellant did not put his fingers inside her vagina. The victim said that she did not tell anyone about the abuse earlier because she was scared, and she denied making up the allegations to punish the appellant for disciplining her. On recross examination, the victim acknowledged that her brother got a cellular telephone when he was twelve years old.

John Barker, a licensed marriage, family, and adolescent therapist, testified that he began counseling S.W. in June 2010. On June 9, 2010, Barker met with S.W. for the first time. He met with her again on June 16 and 24. Based on information from their meetings, Barker contacted the Department of Children's Services (DCS) to report that S.W.'s daughter had been abused by the child's father. On June 26, Barker met with the victim to inform her that he had filed the report. He also questioned the victim about the abuse. The victim told Barker that the appellant touched her under her clothing but that he did not penetrate her. Barker said the victim "confirmed that it happened five times."

On cross-examination, Barker testified that when he first met with S.W., she said she was separated from her husband because her husband had abused their daughter. Barker stated that during his second meeting with S.W., he "directed" her to "elaborate on what that meant." S.W. told Barker that her husband had sexually abused their daughter and that the abuse had not been reported to authorities.

S.W., the victim's mother and the appellant's ex-wife, testified that she met the appellant when she was fourteen years old. They were together for twenty years and married for sixteen years. They had two children, and S.W. divorced him in June 2011. In the summer of 2004, S.W. and the appellant were living in Hendersonville but decided to separate. During that time, the appellant lived in Preston Run Apartments and saw their children on Wednesdays and every other weekend. Their daughter, the victim, was ten years old, and their son, Z.W., was seven years old. S.W. and the appellant reconciled about

-4-

Thanksgiving 2004. After they reconciled, the appellant wanted to buy the victim a cellular telephone. S.W. thought the idea was "ridiculous" because the victim was only in the sixth grade and did not need a phone. S.W. said the appellant "kept pushing and pushing," so they got the victim a cellular telephone for Christmas.

S.W. testified that one day in 2008 when the victim was thirteen years old, S.W. was at work and received a telephone call from the victim. The victim was very upset and crying and told S.W. that the appellant had spanked her "really, really bad." S.W. said that the appellant's spanking the victim was not unusual and that he could be "very violent toward her, very angry at her all the time." The victim wanted S.W. to come home, so S.W. decided to leave work. On her way home, she received a telephone call from Samantha Searcy and went to Searcy's house. The victim was there, and S.W. learned that the appellant had molested the victim while S.W. and the appellant were separated in 2004. S.W. drove home and spoke with the appellant, and he denied the victim's allegations. S.W. and the appellant went to the Searcy home to speak with the victim. S.W. said that Searcy was "threatening to call DCS" and that S.W. and the appellant "were really worried about that." Therefore, they decided to take the victim home and "settle it as a family together by ourselves." S.W. said that she did not believe the victim because she and the appellant had been together their whole lives and because she could not imagine the appellant's "doing anything like that."

S.W. testified that when the three of them got home, she was the only one talking and that the discussion was "tabled because nobody could really figure out what had happened." Later that day, the victim spoke with S.W. in S.W.'s bathroom. The victim told S.W. that "it really happened" and that the appellant "washed his hands after he did it." S.W. stated that while the victim was talking with her, the appellant was outside the bathroom door, pacing back and forth. The victim was afraid that the appellant was going to come into the bathroom, so she would not say anything else. The next day, S.W. left for a business trip. She said she was not afraid to leave the victim with the appellant because she was in shock and "just kind of wanted to shove it under the carpet." While S.W. was away, she telephoned the appellant and told him that she could not stop thinking about the victim's allegations. She said she also told him that if the victim's allegations were true, she and the appellant were going to divorce, and he was never going to see their children again. S.W. said the appellant "freaked out" and hung up the telephone. About an hour later, he called her and told her that the victim had something to tell her. The victim got on the phone and told S.W. that she had made up the allegations. S.W. asked the victim if she was sure, and the victim stated, "[N]o, Mom, I made it up."

S.W. testified that in 2010, when the victim was fifteen years old, she went on another business trip. When she returned home, the appellant screamed at her and accused her of cheating on him. S.W. told the appellant that he had an anger problem and that they were

going to divorce if he did not get help. S.W. said that she and the victim went to a "smoothie shop" to talk and that the victim wanted to know if S.W. and the appellant were going to divorce. S.W. said the victim told her, "I cannot go through that again because when you were separated is when that happened to me." The victim told S.W. that the appellant had made her lie about the allegations being untrue.

S.W. testified that she and the victim went home and that she confronted the appellant. The appellant never claimed the victim was lying. He wanted to know what S.W. was going to do and wanted to know if she was going to call the police. Later, he confessed to touching the victim, and he and S.W. decided to divorce. S.W. said the appellant told her that he had been "laying there in the bed," that "something came over [him]," and that he could not stop himself. The appellant touched the victim under her underwear. S.W. told the appellant that the victim had claimed he washed his hands afterward. She said the appellant stated that "that was the first time that he did it." The appellant told S.W. that he woke up touching the victim, "freaked out," and washed his hands because he "felt really dirty and he realized what he had done." The appellant admitted to S.W. that he touched the victim more than once.

S.W. testified that she and the appellant talked with the victim. The appellant told the victim that he and S.W. were going to divorce and that it was not the victim's fault. S.W. and the appellant decided that he would not date anyone with children, that he would get counseling, and that they would not contact DCS or the police. The appellant moved out of their home in January 2010, and S.W. filed for divorce in March 2010. S.W. started having trouble sleeping and eating, so she decided to see a counselor. She did not know that the counselor was required to report the abuse to DCS. Although S.W. told her counselor about the abuse, she never heard from DCS or the police. In August 2010, she contacted the police herself. She said she never tried to extort money from the appellant and was not jealous about his dating other women. The appellant had breached their agreement by seeing women with children and by not receiving counseling. At some point, S.W. and the police made a controlled call to the appellant, and he made admissions to her. Although S.W. had allowed her children to visit the appellant, the victim decided to stop seeing him. The State closed its direct examination of S.W. by asking her if she ever noticed any unusual behavior by the victim while she and the appellant were separated in 2004. S.W. recalled that one time when the victim was preparing to visit the appellant, the victim had a "major outburst" because her pajama pants were not clean. S.W. said the victim was "screaming and crying and saying that she wanted her pajama bottoms."

On cross-examination, S.W. testified that the victim was "rebelling a little" when the victim was thirteen years old. She said that the victim would lie sometimes when the victim got into trouble but that "I wouldn't say she was a liar." S.W. did not remember telling anyone that the victim was going through a "lying phase" when the victim was thirteen.

Defense counsel asked S.W. if the victim was going through a lying phase at that age, and S.W. answered, "I don't know." S.W. acknowledged that she did not believe the victim's allegations at first but said that she had some doubts about the appellant's denying the abuse. The appellant never told S.W. that he touched the victim's vaginal area only to apply medication when she was a baby. In 2008, the victim told S.W. that the appellant had penetrated her. S.W. said that the victim did not understand the meaning of "penetrate"and that she explained it to the victim. The victim then said that the appellant had not penetrated her. S.W. acknowledged telling someone at DCS in 2010 that the appellant had penetrated the victim. She said she was referring to what the victim revealed to her in 2008. S.W. also acknowledged telling someone at DCS that the victim had claimed the appellant always made her sleep between him and Z.W. S.W. stated that when the victim telephoned in 2008 and said that she had lied about the abuse, S.W. wanted to believe the victim was lying and "chose to do that." She said the victim and the appellant used to argue frequently.

S.W. testified that she did not want to report the abuse to the police because the appellant was paying her eight hundred dollars per month for child support and that she was worried he would not be able to pay her if he went to jail. She said she may have sent a text message to the appellant stating, "[W]hy are you ignoring me?" However, she did not remember if or when she sent the message. She acknowledged sending another message that stated, "[Y]ou will regret this." However, she said, "I can't tell you what [the message] was about." The controlled telephone call was made to the appellant at work. S.W. acknowledged that she continued to have a sexual relationship with him after they separated in January 2010. She said she and the appellant still loved each other after they separated and had sex as late as October 2010. She denied using the victim's allegations to force the appellant to do what she wanted, including paying child support.

On redirect examination, S.W. testified that after the appellant moved out of their home in January 2010, they maintained a very close relationship. On the day of the appellant's arrest in December 2010, he telephoned her fifteen times from jail. The appellant was not angry with her and never accused her of trying to get money from him.

Travis Belcher testified that in the fall of 2004, he and the appellant were roommates and good friends. They shared a two bedroom apartment in Preston Run Apartments. Belcher's children would visit him at the apartment one weekend, and the appellant's children would visit the appellant the following weekend. A pull-out sofa was in the living room, and Belcher's children slept on it when they visited. The appellant's children always slept in his bedroom.

Samantha Searcy testified that her daughter, Brittany Kuntz, was good friends with the victim and that Searcy knew the victim's parents through the girls' friendship. One day,

Kuntz received a telephone call from the victim. Kuntz told Searcy they had to pick up the victim because the appellant had "beat her" and the victim could not contact her mother. Searcy went alone to the victim's house. The victim was sitting on the front steps and was crying. The appellant came to the door and allowed the victim to leave with Searcy. Searcy and the victim returned to Searcy's home, and the victim showed Searcy red marks on her arms, legs, and back. The victim and Kuntz went into Kuntz's bedroom for a while. Then Kuntz told Searcy that the victim had something to tell her. Searcy went into Kuntz's bedroom, and the victim, who was shaking, nervous, and crying, told Searcy that the appellant had been molesting her. Searcy said the victim told her "some very specific things that he had done to her," including that the appellant had "fingered her while she was in her bed at night, that he would come into her room." Searcy spoke with the victim's mother and told her what the victim had said. Later that day, the victim's parents arrived at Searcy's house and talked with Searcy and her husband. Searcy told the victim's parent that she did not "feel good" about the victim's returning home with them. Searcy wanted to report the victim's allegations to the police but did not because the victim was scared and asked her not to report the allegations. Searcy said the victim's parents "wanted to handle it as a family unit."

On cross-examination, Searcy testified that when she went to pick up the victim, the appellant was calm. The victim told Searcy that the appellant had sexually abused her in her bedroom while she was sleeping.

Detective Sergeant Patrick Brady of the White House Police Department testified that he began investigating the case in August 2010 and met with the victim's mother, S.W. A few days later, Sergeant Brady and S.W. made a controlled telephone call to the appellant. The State played an audio recording of the call for the jury. During the call, the appellant said he touched the victim's vagina "on the top" but denied penetrating the victim. Sergeant Brady said that he did not interview the victim because it was standard protocol in sexual abuse cases for juvenile victims to be interviewed by someone from the Child Advocacy Center. Sergeant Brady also never interviewed the appellant.

At the conclusion of Sergeant Brady's testimony, the State rested its case and moved that counts 3 and 4 be dismissed. The trial court granted the motion. Regarding count 1, the State made an election of offenses reflecting that the aggravated sexual battery was based on the alleged incident in which the appellant washed his hands. Regarding count 2, the State made an election of offenses reflecting that the aggravated sexual battery was based on the alleged incident in which the victim rolled away from the appellant to make the touching stop.

Cicilly Dixon a DCS Child Protective Services investigator testified for the appellant that she investigated the victim's case and interviewed the victim's mother. Dixon acknowledged that the victim's mother said the victim was going through a "lying phase" in 2008. The victim's mother also told another DCS employee that the victim had claimed digital penetration. S.W. never told Dixon that the penetration did not occur.

Heather Hesson testified that she babysat the victim and her brother in the summer of 2004. Hesson babysat the children Monday through Friday and got to see the victim interact with the appellant. Hesson never saw the appellant act in a threatening manner toward the victim. She said that the victim did not seem afraid of the appellant and that they appeared to have a typical father/daughter relationship. On cross-examination, Hesson acknowledged that the victim's parents were still living together in 2004 when she babysat the children.

Rocky Isabell testified that he began working with the appellant about eight years before trial and that they were good friends in 2004. Isabell visited the appellant's apartment while the appellant was separated from S.W. and saw the appellant discipline the victim. Isabell did not see the appellant spank the victim or act in a mean or hateful manner toward her. The victim never acted afraid of the appellant.

The then thirty-seven-year-old appellant testified that he worked on heaters and air conditioners prior to his arrest in this case. When the victim was young, the appellant babysat her during the day while S.W. worked as a waitress. He said that the victim got diaper rash "quite a bit" and that he and S.W. applied medication to her vaginal area. When the victim got older, S.W. worked many hours each day, so the appellant kept the victim and Z.W. The appellant acknowledged that he ended up as the children's main disciplinarian but said that he was not physically abusive to the victim and never threw a cellular telephone at her. He acknowledged that he spanked the victim with a paint stick but said that he did not leave bruises on her.

The appellant testified that one time when the victim was thirteen years old, he spanked her, causing welts on her legs and buttocks. He acknowledged that the spanking was "harsh." Samantha Searcy arrived at the appellant's home, and the appellant allowed the victim to leave with her. Later, the appellant received a telephone call from S.W., who told him that the victim was claiming he touched her a couple of years ago. The appellant and S.W. went to Searcy's house. That night, they returned home with the victim. He said that he and S.W. tried to talk with the victim about her allegations but that the victim was upset and "wasn't saying much." The victim and S.W. went into the bathroom to talk while the appellant watched television in the bedroom. He did not try to interfere with their conversation. The next day, S.W. left for a business trip. While she was gone, the appellant and the victim discussed the victim's allegations. The appellant knew the victim's

allegations were untrue and told her that he could get into trouble. The victim told the appellant that she wanted to call S.W. and tell S.W. that she had lied. The appellant did not stand over the victim while she made the call.

The appellant testified that although the victim recanted her allegations, S.W. continued to bring them up. The appellant said he would tell S.W. that the only time he touched the victim was "to medicate her." One day in January 2010, the appellant and S.W. had a terrible argument. The next day, the appellant and S.W. mutually decided to separate. The appellant said that at some point, S.W. told him that the victim's allegations of sexual abuse had "come up again" and that "if you do this, this, and this, then I won't report it." The appellant agreed to pay S.W. $830 per month for child support. However, S.W. was making more money than the appellant, and he told her in June or July 2010 that he was going to have to reduce the amount. He was also dating women, and S.W. expressed jealousy. The appellant said that S.W. would bring up reporting the victim's allegations, that she would ask him to do things, and that she would be "hard to get along with" if he did not do them. In August 2010, the appellant received a text message from her stating, "'You will regret this.'" Four days later, he received the controlled call. At the time of the call, the appellant was working inside a school air conditioning unit and was having trouble hearing. He said that when he told S.W. during the call that he touched the victim, he was referring to the medication he put on the victim as a child. He had told S.W. about the medication many times before. He said he did not specifically mention the medication during the controlled call because he was busy working and assumed S.W. knew what he was talking about. On the day of the appellant's arrest, he telephoned S.W. because he wanted to see their children.

On cross-examination, the appellant acknowledged that the victim was fabricating her sexual abuse allegations. The victim told the appellant that she wanted a cellular telephone because most of her friends had phones, so the appellant got her a phone for Christmas. He acknowledged that after he and S.W. separated in January 2010, he agreed to get counseling and stay away from women with children. However, he said that he was "just trying to appease" S.W. because he was scared and because S.W. wanted child support and "other things." He acknowledged that in a prior proceeding, he stated that S.W. did not threaten him over child support. He also acknowledged that although S.W. made false allegations against him, he continued to have a sexual relationship with her. S.W. sent a text message to the appellant saying that "you will regret this" because she had been "texting" him and he would not respond to her. On the day of his arrest, the appellant telephoned S.W. and was nice to her because he wanted her to bring their children to see him.

Brittany Kuntz testified for the appellant that the victim revealed to her the appellant's sexual abuse. The victim told Kuntz that the appellant touched her in her bedroom.

Kyle Marquardt testified for the appellant as an expert in the determination and calculation of child support. He stated that was employed by Child Support Services PSI, a subcontractor for the Department of Human Services to establish paternity, determine support, and pursue people not paying support. In cases such as this one, where the mother's annual income was $90,000 per year and the father's income was $70,000, the parents' sharing custody would have resulted in the mother's paying child support to the father. If the mother had primary custody, the father would have paid the mother $800 to $900 per month for two children.

The jury convicted the appellant as charged of two counts of aggravated sexual battery, a Class B felony. After a sentencing hearing, the trial court sentenced him to ten years for each conviction to be served concurrently.

## II. Analysis

### A. Sufficiency of the Evidence

The appellant contends that the trial court erred by denying his motion for judgment of acquittal and that the evidence is insufficient to support the convictions because the only evidence against him was the victim's testimony and "the testimony of others who simply repeated the allegations made by her." The State argues that the evidence is sufficient. We agree with the State.

When an appellant challenges the sufficiency of the convicting evidence, the standard for review by an appellate court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e). The State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions concerning the credibility of witnesses and the weight and value to be afforded the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh or reevaluate the evidence, nor will this court substitute its inferences drawn from the circumstantial evidence for those inferences drawn by the jury. Id. Because a jury conviction removes the presumption of innocence with which a defendant is initially cloaked at trial and replaces it on appeal with one of guilt, a convicted defendant has the burden of demonstrating to this court that the evidence is insufficient. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). "The standard by which the trial court determines a motion for judgment of acquittal at the end of all the proof is, in essence, the same standard which applies on appeal in determining the sufficiency of the evidence after

a conviction." State v. Thompson, 88 S.W.3d 611, 614-15 (Tenn. Crim. App. 2000).

Aggravated sexual battery as it applies to this case is defined as "unlawful sexual contact with a victim by the defendant or the defendant by a victim [and] . . . [t]he victim is less than thirteen (13) years of age." Tenn. Code Ann. § 39-13-504(a)(4). "'Sexual contact' includes the intentional touching of the victim's [or] the defendant's . . . intimate parts, . . . if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification." Tenn. Code Ann. § 39-13-501(6).

The appellant does not contest the sufficiency of the evidence regarding the elements of the offense. Instead, he contends that the victim is not credible because she made the allegations against him while she was going through a "rebellious phase," recanted the allegations the next day, and was not believed by her own mother, S.W. The appellant contends that S.W. also was not credible because she did not contact the police or try to prevent the victim from seeing him until she realized her therapist was going to have to report the allegations, forcing her to contact the police in order to "avoid trouble for herself." The appellant claims that the jury should have discredited S.W.'s testimony because she sent threatening texts to him and because he explained to her that he touched the victim's vaginal area to apply medication when the victim was a baby.

Determining the credibility of witnesses is within the purview of the jury. See State v. Millsaps, 30 S.W.3d 364, 368 (Tenn. Crim. App. 2000) (stating that "the weight and credibility of the witnesses' testimony are matters entrusted exclusively to the jury as the trier[ ] of fact"). In the instant case, the jury clearly resolved the issue of credibility in the State's favor. We may not now reconsider the jury's credibility assessment. See State v. Carruthers, 35 S.W.3d 516, 558 (Tenn. 2000). Therefore, we conclude that there is ample proof to sustain the appellant's convictions of aggravated sexual battery.

## B.  Election of Offenses

Next, the appellant contends that the State's inadequate election of offenses deprived him of his constitutional right to a unanimous verdict for count 2. Specifically, he claims that because the victim testified that she always rolled over to make the touching stop, including the incident when the appellant washed his hands, that fact was insufficient to distinguish the incident alleged in count 2 from any other incident. The State argues that it elected two separate instance of aggravated sexual battery because the victim did not testify that she rolled over every time he touched her. We conclude that the State's election of offenses was sufficient in this case to ensure a unanimous verdict.

-12-

After the State rested its case-in-chief, it made the following election of offenses:

> Count 1 of the indictment alleges an act of aggravated battery against [the victim], DOB 4-29-94, and refers to the following conduct. The defendant fondled [the victim's] genitals by rubbing his fingers back and forth on the inside of her labia. This occurred in the defendant's bedroom at the apartment where he lived at Preston Run Apartments. The victim recalled that she woke up to find the defendant had put his hand up the bottom of her shorts, touching her genitals underneath both her shorts and underwear on the skin. When the touching was over, [the victim] recalled that the defendant went to the bathroom and washed his hands. This is the only occasion of touching wherein the defendant washed his hands when it was over.

> Count 2 of the indictment alleges an act of aggravated sexual battery against [the victim], DOB 4-29-94, and refers to the following conduct. The defendant fondled [the victim's] genitals by rubbing his fingers back and forth on the inside of her labia. This occurred in the defendant's bedroom at the apartment where he lived at Preston Run Apartments. The victim recalled that she woke up to find the defendant had put his hand up the bottom of her shorts, touching her genitals underneath both her shorts and underwear on the skin. [The victim] recalled that she rolled away from the defendant to make the touching [stop].

When an indictment charges that a number of sexual offenses occurred over a span of time, the State may introduce evidence of any unlawful sexual activity between the defendant and the victim allegedly occurring during that span of time. State v. Rickman, 876 S.W.2d 824, 828-829 (Tenn.1994). However, at the conclusion of its case-in-chief, the State must elect the particular incident for which a conviction is being sought. See Burlison v. State, 501 S.W.2d 801, 803 (Tenn. 1973); see also State v. Johnson, 53 S.W.3d 628, 630 (Tenn. 2001). This requirement of election serves several purposes: (1) it enables the defendant to prepare for the specific charge; (2) it protects a defendant against double jeopardy; (3) it ensures the jurors' deliberation over and their return of a verdict based upon the same offense; (4) it enables the trial judge to review the weight of the evidence in its role as the thirteenth juror; and (5) it enables an appellate court to review the legal sufficiency of the evidence. State v. Brown, 992 S.W.2d 389, 391 (Tenn. 1991).

Recognizing the practical difficulties present in applying the election requirement in cases of child sexual abuse, our supreme court has granted that "the state is not required to identify the particular date of the chosen offense. . . . [A] particular offense can often be identified without a date." State v. Shelton, 851 S.W.2d 134, 137 (Tenn. 1993); see Brown, 992 S.W.2d at 392 (providing that "[t]he State is not required to prove that an offense was committed on a specific date unless the date is an element of the crime or essential to proving the offense."). As the court explained,

> If, for example, the evidence indicates various types of abuse, the prosecution may identify a particular type of abuse and elect that offense. Moreover, when recalling an assault, a child may be able to describe unique surroundings or circumstances that help to identify an incident. The child may be able to identify an assault with reference to a meaningful event in his or her life, such as the beginning of school, a birthday, or a relative's visit. Any description that will identify the prosecuted offense for the jury is sufficient. . . . [T]he trial court should bear in mind that the purpose of election is to ensure that each juror is considering the same occurrence. If the prosecution cannot identify an event for which to ask a conviction, then the court cannot be assured of a unanimous decision.

Shelton, 851 S.W.2d at 138. "A defendant's right to a unanimous verdict before imposition of conviction requires the trial court to take precautions to ensure that the jury deliberates over the particular charged offense, instead of assembling a 'patchwork verdict' based on the different offenses in evidence." Tidwell v. State, 922 S.W.2d 497, 501 (Tenn. 1996).

Turning to the instant case, the victim testified that the appellant put his hands in her underwear, that he touched her inside of her labia but outside her vagina, and that he moved his fingers back and forth. She said that the touching occurred more than once while her parents were separated in 2004 and that the appellant washed his hands afterward one time. The appellant claims that the victim also said she rolled over during each incident to stop the abuse. However, our review of the transcript shows that the victim never specifically stated that she always rolled over. Instead, she said, "I would just try and move and roll over." The State asked the victim if the appellant ever touched her when her brother was not sleeping in the bed with them, and she said yes. The State then asked, "What do you remember about that?" The victim answered, "I just remember that there was enough room where I could roll over." Thus, the victim clarified that one time, when the appellant was touching her and her brother was not in the bed with them, she rolled over to stop the abuse. In our view, the victim described a unique circumstance, i.e., her rolling over one time while her brother was

-14-

not in the bed, that resulted in the identification of a separate instance of conduct for count 2. In any event, we conclude that the evidence in this case is "of such a quality that there was no risk that the jury's verdicts were less than unanimous and that the failure to require election was harmless beyond a reasonable doubt." State v. Paul Ralph Leath, No. 01C01-9511-CC-003921998, Tenn. Crim. App. LEXIS 655, at *25 (Nashville, June 17, 1998). The evidence admitted no possibility that some member of the jury could choose a different offense than that chosen by the other members.

## C. Mistrial

Finally, the appellant contends that the trial court erred by failing to grant his request for a mistrial when S.W. testified that he refused to take a polygraph examination. The State argues that the trial court properly denied the appellant's request for a mistrial. We agree with the State.

During S.W.'s cross-examination, defense counsel asked her if the appellant told her that he touched the victim when the victim was young to apply medication. S.W. answered, "No, he never said that to me. He said -- I asked him to take a lie detector test and he said -- [.]" Defense counsel interrupted and objected, and the trial court stated, "Disregard, ladies and gentlemen. You are to disregard that comment. Do not consider it at all." S.W.'s cross-examination continued, and she did not mention the polygraph again. At the conclusion of S.W.'s testimony, defense counsel requested a mistrial because S.W. "blurted about her asking [him] to take a polygraph." The trial court denied the motion, stating, "I've already corrected it."

A mistrial should be declared in criminal cases only in the event that a manifest necessity requires such action. State v. Millbrooks, 819 S.W.2d 441, 443 (Tenn. Crim. App. 1991). In other words, a mistrial is an appropriate remedy when a trial cannot continue or a miscarriage of justice would result if it did. State v. McPherson, 882 S.W.2d 365, 370 (Tenn. Crim. App. 1994). The decision to grant a mistrial lies within the sound discretion of the trial court, and this court will not interfere with the exercise of that discretion absent clear abuse appearing on the face of the record. See State v. Hall, 976 S.W.2d 121, 147 (Tenn. 1998). Moreover, the burden of establishing the necessity for mistrial lies with the party seeking it. State v. Williams, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996).

We note that "testimony regarding a [d]efendant's willingness or refusal to submit to a polygraph examination is not admissible." State v. Stephenson, 195 S.W.3d 574, 599 (Tenn. 2006) (appendix). In the instant case, defense counsel interrupted S.W. before she was able to reveal whether the appellant refused to take the examination. In any event, the appellant claims that the trial court should have declared a mistrial because S.W.'s testimony

"left [the jury] with the impression that he did not take the test and must have something to hide." However, the trial court immediately instructed the jury to disregard her comment and "not consider it at all." Generally, we presume that a jury has followed the trial court's instructions. See State v. Butler, 880 S.W.2d 395, 399 (Tenn. Crim. App. 1994). Therefore, the appellant is not entitled to relief.

### III. Conclusion

Based upon the record and the parties' briefs, we affirm the judgments of the trial court.

_____
NORMA McGEE OGLE, JUDGE